**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AARON WILLIAMS<br>6211 Baynton Street<br>Philadelphia, PA 19144 | :<br>:<br>: | CIVIL ACTION |
| Plaintiff, | :<br>: | No. 23-2277 |
| v. | :<br>: | |
| FC COMPASSUS, LLC, d/b/a Compassus<br>10 Cadillac Drive, Ste. 400<br>Brentwood, TN 37027 | :<br>:<br>:<br>: | **JURY TRIAL DEMANDED** |
| Defendant. | :<br>: | |

## FIRST AMENDED COMPLAINT

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1. This action has been initiated by Aaron Williams (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) against FC Compassus, LLC, d/b/a Compassus (hereinafter, "Defendant"). Plaintiff asserts violations of Section 1981 of the Civil Rights Act of 1866 ("Section 1981" - 42 U.S.C. § 1981) and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et. seq*.) for being retaliatorily terminated from his employment.[1] As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

---

[1] Plaintiff has pending claims before the Pennsylvania Human Relations Commission ("PHRC"). Administrative exhaustion is required for such claims, absent waiver of exhaustion by Defendant. For notice purposes, Plaintiff states herein that he intends to amend this lawsuit to include identical claims upon such exhaustion (or waiver by Defendants).

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. Any state claims amended herein or included would be proper under this Court's ancillary or supplemental jurisdiction to hear state claims arising out of the same common nucleus of operative facts as those set forth in Plaintiff's federal claims.

3. This Court may properly maintain personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this District because actions underlying this case occurred in this District, and Defendant is deemed to reside where it is subject to personal jurisdiction (rendering venue appropriate for multiple reasons).

5. Plaintiff properly exhausted his administrative remedies to proceed under Title VII because he timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), has been issued his Notice of Right to Sue, and has timely filed this First Amended Civil Action Complaint within 90 days of receiving his Notice of Right to Sue.

## PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult female residing at the above-captioned address.

8. FC Compassus, LLC, d/b/a Compassus ("Defendant") is headquartered in Brentwood, Tennessee. This entity has more than 1,000 employees, and it provides an array of health-related services (including in-home care). Plaintiff worked for Defendant at its "Newtown Square Hospice" in Newtown, Pennsylvania (as Defendant has many locations in the United States).

9. At all times relevant herein, Defendant acted by and through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. Plaintiff is a black (African-American) male.

12. Plaintiff was hired by Defendant on or about October 27, 2022; and in total, Plaintiff was employed with Defendant for approximately five (5) months until termination.

13. Plaintiff was employed as a Hospice Care Consultant, and he was supervised by Lee Siegfried (Area Market Executive of Defendant).

14. The gist of Plaintiff's lawsuit herein is that he expressed concerns of racial discrimination, and he was then placed on action plan (or performance improvement plan) and then terminated.

15. Upon hire, Plaintiff was required to shadow another employee, Mathew O'Brien ("O'Brien"). O'Brien is Caucasian. Plaintiff perceived O'Brien to be discriminatory based upon race (from his in-person interaction(s)). In particular, O'Brien:

- talked down to Plaintiff as if he were dense or incompetent.

- made snarky comments inquiring if this were even the job for Plaintiff;
- continually looked Plaintiff up and down as if disgusted by Plaintiff's appearance; and
- was very abrupt, offensive, and point-blank mean to Plaintiff for no legitimate reason.

16. After initially shadowing O'Brien, Plaintiff was very upset at how he was mistreated. Plaintiff witnessed O'Brien communicate in a humorous or affable manner with others who were non-black. Throughout this shadowing, Plaintiff tried to be as pleasant as possible and at all times remained professional. But Plaintiff experienced significant anxiety and sadness as a result of the aforesaid abusive treatment.

17. The only time Plaintiff physically worked with O'Brien was at the commencement of Plaintiff's employment (when shadowing him for 1-2 days). After the shadowing period (or orientation), Plaintiff would only see O'Brien occasionally at monthly meetings. At such meetings, O'Brien refused to acknowledge Plaintiff, did not reciprocate when Plaintiff tried to say hello, and at times even laughed while looking at Plaintiff. This continued to bother Plaintiff, as Plaintiff perceived O'Brien to be alienating him from other coworkers (affecting his overall work environment).

18. As time progressed, Plaintiff was getting daily or weekly notifications that O'Brien was viewing his social media (including his LinkedIn profile). O'Brien was merely a lateral coworker (in a non-supervisory) role. He had no reason to continually check Plaintiff's social media.

19. Plaintiff asked colleagues about whether O'Brien checked their social media, and Plaintiff was informed nobody else had similar experiences. Plaintiff was <u>the only</u> black (African-American) individual within a team of approximately 10-15 employees at any given time and felt

like O'Brien had a problem with him on account of his race. Again, Plaintiff formed this perception from his in-person interactions - - even in advance of finding it unusual that his social media presence was continually being monitored.

20. By January of 2023, Plaintiff's in-person interactions and the continual social media notices were really so to speak eating at Plaintiff. Defendant had an open-door policy and identified it provided a non-discriminatory work environment. Plaintiff decided he would at least make his concerns known to management in hopes that O'Brien would be respectful to him and not mistreat other black employees in the future.

21. In January and February of 2023, Plaintiff talked on several occasions with Siegfried. Plaintiff explained to Siegfried that he "is the only African American" and the "only black" employee in the group getting across that he felt: (a) O'Brien was <u>really nasty</u> with him when he had to shadow him; (b) O'Brien was disrespectful to him at monthly meetings; and (c) O'Brien keeps looking at his social media. Plaintiff explained he couldn't help but feel that O'Brien had racial issues with him, as O'Brien didn't do any of this with non-black employees.

22. Siegfried told Plaintiff in subsequent discussions that he couldn't speak to claims that O'Brien mistreated him in person, but he did talk to O'Brien about continually going on Plaintiff's social media. Siegfried told Plaintiff O'Brien was reporting to management (including him) that it appeared as if Plaintiff was looking for a new job and here may not be a good fit for him (per his social media review of Plaintiff). O'Brien then questioned Plaintiff about whether or why he was looking for a new job, expressing that would show a lack of interest in Plaintiff's job. This further bothered Plaintiff because he was not looking for a new job, nothing could be further from the truth, and it appeared as if O'Brien was attempting to negatively impact perceptions of Plaintiff (*or possibly cause Plaintiff to be terminated* with false statements).

23. In or about February of 2023, Plaintiff informed Siegfried he was still really bothered by how abusive O'Brien was during the shadow period, his meeting demeanor, daily or weekly review of his social media, and false representations to management that Plaintiff was looking for another job. O'Brien didn't like Plaintiff for no apparent (or business) reason - - prompting Plaintiff to strongly feel O'Brien was racist. Plaintiff shared these views with Siegfried, explaining he has never made such concerns in a work environment but just really had a strong feeling from being around Siegfried (and everything had occurred).[2]

24. On or about March 7, 2023, Plaintiff was issued what is referred to as an action plan or performance improvement plan providing Plaintiff with expected goals <u>through May of 2023</u>. Plaintiff believed that Siegfried was frustrated with Plaintiff's concerns to him; but more importantly, Plaintiff's escalation to human resources (after talking with Siegfried) because Plaintiff didn't believe that Siegfried was very responsive or taking Plaintiff's concerns seriously.

25. On or about March 20, 2023 (the "March 20th call"), Plaintiff was contacted by Tanesha Bradshaw ("Bradshaw") and Kristie Webber ("Webber"). They explained their express purpose in contacting Plaintiff was merely to inform him that they concluded their investigation racial discrimination investigation. They informed Plaintiff that they were unable conclude there was any racial discrimination (and the company was unwilling to mediate or have a joint discussion

---

[2] To proceed with a retaliation case, "a plaintiff need not prove the merits of the underlying discrimination complaint, but only that 'he was acting under a good faith, reasonable belief that a violation existed.'" *Boykins v. SEPTA*, 722 F. App'x 148, 157 (3d Cir. 2018). *See also e.g. White v. Purolite Corp*., 2020 U.S. Dist. LEXIS 66171, at *14 (E.D. Pa. 2020)(denying summary judgment and explaining employee had reasonable belief to support discrimination complaint when complaining he thought scheduling of overtime was unfair based upon race, even though he turned out to be totally wrong); *Broady v. ABM Janitorial Servs*., 2015 U.S. Dist. LEXIS 15722, at *8 (E.D. Pa. 2015)(denying summary judgment and explaining a jury could conclude that an employee's limited observations of differential treatment based on race were made in good faith).

with O'Brien to ensure no future animosity, a prior request of Plaintiff). And they asked Plaintiff if he wanted to offer any comments or if he had any questions (before concluding the call).

26. The March 20th call is critical to claims in this lawsuit. During the March 20th call, Plaintiff: (a) expressed concerns that he was dissatisfied with the racial discrimination investigation; (b) he felt there was racial mistreatment; and (c) identified he would be open to discussing a severance package if Defendant didn't want him to proceed with filing a Charge with the Equal Employment Opportunity Commission ("EEOC").

27. In the small segment of the conversation wherein severance was discussed as one potential resolution (during the March 20th call), Plaintiff adamantly represented <u>he was not resigning</u>, he expected to remain employed, and was just referencing his intent to file with the EEOC because he felt at least the EEOC would investigate his concerns more objectively. Plaintiff in fact mentioned his intent to file with the EEOC several times.

28. The March 20th call ended with Plaintiff being told by Bradshaw and Webber that they didn't want him to leave the company, that they would ensure Plaintiff had access to the Employee Assistance Program ("EAP") because he still seemed emotional about his concerns, and that they would discuss Plaintiff's reiterated concerns with Defendant's corporate management.

29. Upon commencing the call during the March 20th call, there was **no intent** of Defendant to terminate Plaintiff. The call was simply to relay results of Plaintiff's racial concerns and an "investigation" that was conducted.

30. Plaintiff however engaged in numerous protected activities during the call, such as:

(1) Expressing dissatisfaction with the racial discrimination investigation;

(2) Stating he felt there were racial concerns;

(3) Being a participant during the call in a racial discrimination claim (as the witness and complainant); and

> (4) Explaining his intent on several occasions of escalating the matter to the EEOC for an impartial investigation.[3]

32. Following the numerous protected activities on the March 20th call, Defendants' human resources acknowledged Plaintiffs' frustration with the investigation and feelings and told him in the future he could use the EAP program (and to feel fee to raise future concerns through his management hierarchy).

32. <u>Less than twenty-four (24) hours later</u> (on or about March 21, 2023), Plaintiff was abruptly terminated in person by Defendant's management and human resources personnel. Plaintiff was given no reason, and he was directed to immediately return all belongings to the company.

33. There was no business rationale to terminate Plaintiff, as he had only been given an action or performance improvement plan a few weeks earlier with goals through May of 2023 (aside from the plan itself being retaliatory).

34. And the only intervening event(s) in the March 20th call was Plaintiff's protected activities (outlined *supra*). Thus, Plaintiff was unequivocally terminated for his protected activities and was unlawfully retaliated against.[4]

---

[3] *See e.g. EEOC v. L.B. Foster Co.*, 123 F.3d 746, 754 (3d Cir. 1997)(expressing an intent to file an EEOC Charge, even if later changing ones' mind (or never in fact filing) is "protected activity" prohibiting retaliation).

[4] Employees making sexual harassment or discrimination complaints often explain they are upset, are considering leaving a company, or are willing to discuss severance if a situation isn't remedied. If Defendant claims that Plaintiff didn't seem happy and thus terminated him, Plaintiff believes this is tantamount to conceding liability (as no discrimination Plaintiff is happy and thus such permissible termination(s) would open the door to terminating every discrimination complainant).

## Count I
## Violations of 42 U.S.C. § 1981
### (Retaliation)

35. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

36. Plaintiff seeks relief herein for being issued an action plan / PIP and for his subsequent termination from employment. Plaintiff's claims herein are for retaliation because he engaged in protected activities, including but not limited to: (a) voicing concerns of racial mistreatment by a coworker; (b) expressing an intent to file with the EEOC; (c) expressing dissatisfaction with a discrimination investigation; (d) being a participant in a discrimination investigation; and (e) for other implicit or explicit protected activities.

37. Said actions were taken against Plaintiff retaliatorily in violation of 42 U.S.C. § 1981.

## Count II
## Violations of Title VII of the Civil Rights Act
### (Retaliation)

38. The foregoing paragraphs are incorporated herein in their entirety as if set for in full.

39. Plaintiff seeks relief herein for being issued an action plan / PIP and for his subsequent termination from employment. Plaintiff's claims herein are for retaliation because he engaged in protected activities, including but not limited to: (a) voicing concerns of racial mistreatment by a coworker; (b) expressing an intent to file with the EEOC; (c) expressing dissatisfaction with a discrimination investigation; (d) being a participant in a discrimination investigation; and (e) for other implicit or explicit protected activities.

40. Said actions were taken against Plaintiff retaliatorily in violation of Title VII.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority;

B. Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

C. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

D. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

E. Plaintiff is to receive a trial by jury as requested in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq.
3331 Street Road
Two Greenwood Square
Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: June 20, 2023